IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SAMUEL COLE, )<br>Plaintiff, )<br>)<br>v. )<br>)<br>CTI MOLECULAR IMAGING, INC., )<br>Defendant. ) | | 3:04-cv-329 |

## **MEMORANDUM AND ORDER**

Defendant, CTI Molecular Imaging, Inc. (CTI), has moved for summary judgment [ECF # 43]. Plaintiff, Samuel Cole (Cole), has responded [ECF # 49, 52]. Defendant has replied to plaintiff's response [ECF # 55]. For the reasons that follow, defendant's dispositive motion is **DENIED**.

Plaintiff alleges that CTI harassed him and terminated his employment as a result of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3, *et seq*. (Title VII) and in retaliation for a complaint he filed with CTI senior management on or about March 7, 2003. After commencing this action, plaintiff, who was born and educated in Nigeria, moved for leave to amend his complaint to also allege that he had been harassed and discriminated against on the basis of his national origin in violation of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1981A.

**BACKGROUND**

On March 11, 2002, plaintiff began working as an Oracle Financial Application Specialist at the Knoxville headquarters of CTI, a leading manufacturer of positron emission tomography (PET) imaging equipment and related products used in the detection and treatment of cancer, cardiac disease and neurological disorders. Plaintiff's duties included, but were not limited to, working with end users to facilitate issue resolution, troubleshooting functional application issues, managing and providing day to day Oracle Applications support to end users, providing end user training and defining functional requirements for technical customizations including reports, forms, workflows and scripting. According to defendant, Cole was hired for the position because he purported to have extensive experience in the implementation of Oracle Financial Software, which CTI was implementing at that time in a limited way and was planning to implement company wide. At the time plaintiff was hired, another individual, Ramesh Ayagari (Ayagari), an Indian, was on the Oracle project because of his prior Oracle experience. Defendant contends that shortly thereafter, CTI hired Tunde Bode (Bode), an African American, to help implement the Oracle software.

According to Cole, once he began working at CTI, Beth Hartford (Hartford), the group leader for plaintiff's department, routinely harassed him and made offensive racial comments to him. He states that on one occasion, in response to a suggestion plaintiff made regarding how CTI could improve efficiency and increase production, Hartford told him that there was no way a black man could come here and dictate what to do. Plaintiff claims that whenever he made suggestions about how CTI could improve, his

2

opinions were ignored. Plaintiff further asserts that Hartford was antagonistic toward him and encouraged other employees, namely Joan DeMarcus (DeMarcus), Karla McMaster (McMaster), and Tanya Bagley (Bagley) to antagonize him as well. Plaintiff claims no white employees were subjected to this kind of treatment. In particular, plaintiff contends DeMarcus had in her cubicle a stuffed black monkey with the word, "Nigger" posted on it, but was not reprimanded for the display.

According to defendant, on May 15, 2002, Walter Cromer (Cromer), then the Director of CTI's Information Systems and Services and manager of plaintiff's department, met with plaintiff to discuss the first two months of his employment. Defendant claims that Cromer advised Cole that many of the documents he prepared seemed to be "boilerplate" and appeared to have been adapted from other work rather than customized to meet the specific problem at hand. CTI asserts plaintiff was also told he was not handling problem requests as quickly or independently as was expected from an experienced Oracle Financial Specialist.

In July 2002, plaintiff received a competency review by Cromer. The competency review used a rating scale of 1 to 4, with 1 being the lowest and 4 being the highest. Plaintiff scored a total of 1.38 out of 4, receiving "1s" for Creativity & Innovation, Initiative, Job Knowledge, Problem Solving, and Customer Service. The competency review indicated that plaintiff was "having to come up to speed on Oracle 11i" more than had been anticipated at the time plaintiff was hired.

On July 24, 2002, defendant states Cromer again met with plaintiff to discuss perceived deficiencies in his performance. According to CTI, Cole was told during the meeting that he needed to take more initiative, that he was not sufficiently involved in problem solving of matters in his key responsibility area, and that the documentation he had been developing needed to be simplified and made easier to use.

In approximately November 2002, the IT department at CTI was reorganized, and Hartford became plaintiff's direct supervisor. According to defendant, because of Hartford's involvement in the project since its inception, she received volunteered complaints regarding Cole's performance from team members, including Tanya Pack (Pack), Lisa Jones (Jones), Kathy Woods (Woods) and DeMarcus even prior to becoming plaintiff's supervisor. Specifically, they complained that plaintiff was not able to communicate with end users, did not seem to fully understand the different business units at CTI, and was not helpful in the implementation process.

In December 2002, plaintiff was placed on a Performance Improvement Plan (PIP) by Hartford. The PIP indicated that plaintiff had not met the following performance standards: (1) rapid, independent problem solving of Oracle systems issues, (2) solid foundational knowledge in Oracle applications that can be readily applied to production and implementation tasks and issues, (3) independent reorganization of project needs and initiative taken to address the needs, (4) acquire and retain knowledge related to the project; and (5) timely attendance to scheduled meetings. The PIP further noted as follows: plaintiff's documentation was too wordy and general and did not convey the

necessary information to the appropriate audience concisely; many of plaintiff's project tasks had to be performed and/or corrected or completed by others; plaintiff's response time was slow and he rarely responded to end users face-to-face; plaintiff's level of customer service and sensitivity to end user deadlines was minimal; and plaintiff did not research support issues well and follow-up documentation in the problem log was inadequate.

Plaintiff contends that when he was placed on the first PIP, he was subjected to unequal terms and conditions of employment. Cole asserts that although he made suggestions about ways in which CTI could improve, he was ignored; his performance was scrutinized more closely than that of white employees; he was required to work more hours than white employees; and he was denied tuition reimbursement which was given to white employees. Finally, plaintiff alleges that because of his race and/or national origin, he was terminated.

Plaintiff asserts that CTI provided him with no prior written policy documenting conditions for subjecting employees to a PIP. He claims the false accusations drafted by Hartford on December 13, 2002, were the impetus for defendant directing Cole to complete the long and rigorous Oracle Implementation cycles with an unrealistic timetable. However, he asserts that he successfully completed the PIP, by often working from 7:00 a.m. until 10:00 p.m. and sometimes later in the night. He notes that no white employee was required to work such lengthy hours.

5

On the contrary, CTI claims plaintiff did not complete the requirements of his PIP by the assigned deadlines. Defendant further asserts tasks plaintiff did perform took longer than they should have or were set up improperly. CTI notes that plaintiff was told when he was given his PIP that his failure to improve his performance by January 31, 2003, could result in further disciplinary action, including termination.

In March 2003, plaintiff was given another PIP, detailing four specific objectives he had to complete by March 28, 2003, in order to demonstrate improved performance. In response to the second PIP, on March 7, 2003, Cole filed a complaint to Chief Financial Officer David Gill (Gill), wherein he alleged that he had exhibited exemplary performance but was nevertheless being subjected to a barrage of PIPs. Plaintiff states the concerns he raised in the complaint letter were never addressed. According to plaintiff, because of his race and/or national origin and in retaliation for his complaint letter, Hartsford, Cromer and Mike Lasater (Lasater) conspired to continually harass, intimidate, and threaten him with termination. Cole claims nothing was done by senior management to help him.

In response to plaintiff's complaint, CTI claims its HR Director at that time, Traci Etherton (Etherton), met with plaintiff on March 11, 2003. In a memo she prepared for plaintiff's file, Etherton noted that she told plaintiff of her involvement in the PIP process and that CTI would like to have a positive outcome from his PIP, but termination was a definite possibility if improvement was not made. Interestingly, on May 12, 2003,
6

Hartford acknowledged that plaintiff had met the minimum requirements of the second PIP.

According to defendant, in late June 2003, because of performance deficiencies, plaintiff was taken off the Phase II project implementation team and assigned a new role exclusively supporting Phase I and users under the supervision of Lasater. At the outset of plaintiff's transfer to support, Cole and Lasater worked together to create an Improvement Action Plan (IAP). In this IAP, plaintiff was given ten specific tasks to complete, with deadlines ranging from September 23, 2003 to September 30, 2003. According to defendant, despite these deadlines, plaintiff had not provided Lasater with a written report on the tasks as of October 15, 2003.

Also in June 2003, after gaining admission into the Professional MBA program at the University of Tennessee, plaintiff applied for tuition reimbursement through his then immediate supervisor, Lasater. According to Cole, while tuition reimbursement for this type of educational program was part of his compensation package, and despite having approved tuition requests for two similarly situated white employees, Troy Staton (Staton) and Scott Cannon (Cannon), Lasater denied plaintiff's request for tuition reimbursement.

On July 1, 2003, plaintiff received his annual performance review by Lasater. Cole received an overall score of 1 out of 4 and did not receive a salary increase. Plaintiff's deficiencies in the customer support role were stressed. Afterwards,

7

defendant claims Lasater noted that plaintiff did not grasp Oracle HR processes and needed too much direction. Lasater further asserts he received many complaints regarding plaintiff's performance from end-users and co-workers after Cole was assigned to the support role in July 2003.

On September 4, 2003, CTI claims it was contacted by Larry Mills, a consultant, who expressed his concern that plaintiff did not understand the requirements for Oracle HR and EmployEase. Subsequently, Lasater met with plaintiff on September 9, 2003, at which time Lasater noted it appeared plaintiff was doing basic research on how Oracle HR works, which was information he should already know.

Defendant claims that on November 11, 2003, plaintiff was issued a final warning outlining his performance deficiencies. On November 14, 2003, a weekly status report was submitted to Lasater by plaintiff, on which the supervisor indicated areas in which plaintiff needed further improvement. According to CTI, because of plaintiff's continued failure to improve his performance, he was terminated by Lasater on December 5, 2003.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986); Fed. R. Civ. P. 56(c). The court views the evidence and any reasonable inferences that may be drawn in the light most favorable to the non-moving party. *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986). Furthermore, courts must weigh the evidence not to determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists when there is sufficient evidence on which a trier of fact could reasonably find in favor of the non-moving party. *Id.* at 252. Thus, summary judgment is only "appropriate when the evidence, viewed in a light most favorable to the non-movant, shows that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law." *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 709 (6th Cir. 1992).

To establish a *prima facie* case of race and/or national origin discrimination, plaintiff must show that he (1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was treated differently than similarly situated employees outside the protected class or was replaced by someone outside the protected class. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002); *McNeail-Tunstall v. Marsh USA*, 307 F.Supp.2d 955, 966 (W.D. Tenn. 2004).

Plaintiff states that contrary to the defendant's claim that he has not produced any evidence showing that he was subjected to an adverse employment action other than his termination, at least two other examples of adverse employment actions were suffered by the plaintiff. While completing the PIPs, Cole contends he had to work extremely long hours and was antagonized by his supervisors. According to plaintiff, this increase in hours, when coupled with being antagonized by his supervisors,

9

constituted an adverse employment action. Plaintiff further argues the denial of tuition reimbursement for the fiscal year 2003 was an adverse employment action. Cole notes that this benefit was afforded to similarly situated white employees in the IT department, including Staton and Cannon. CTI claims that this tuition reimbursement is not a benefit guaranteed to employees and that the request came too late to be included in the budget for 2003. Regardless, plaintiff asserts he was adversely impacted by the denial since he had already been accepted into the program beginning in the Fall of 2003. He notes that neither Staton nor Cannon were required to wait until the following year before their requests for tuition reimbursement were approved.

**AMENDED COMPLAINT**

Defendant asserts that in the amended complaint, plaintiff alleged for the first time that he was discriminated against on the basis of national origin as well as race. According to defendant, this was following plaintiff's deposition in which he made no mention of national origin discrimination even after being asked whether he had disclosed all his claims of discrimination. CTI argues plaintiff's admission should estop him from now asserting this claim. Defendant further contends that plaintiff did not allege national origin discrimination in the charge of discrimination he filed with the EEOC, and therefore is precluded from doing so here. *Love v. Pullman Co.*, 404 U.S. 522 (1972).

Cole notes that in this case, he was unassisted by counsel during the time that he pursued his administrative remedies with the EEOC. He contends the Sixth Circuit

10

has recognized that because Title VII is a remedial statute, courts should not narrowly construe an EEOC charge "where such a construction would preclude a plaintiff from bringing a claim." *Duggins v. Steak 'n' Shake, Inc.*, 195 F.3d 828, 832 (6th Cir. 1999). Accordingly, Cole argues a broad reading of the charge is necessary where Title VII claimants are not represented by counsel. Further, while it is true that the plaintiff failed to allege discrimination on the basis of his national origin, he asserts it cannot reasonably be denied that his Nigerian origin is closely related to his race. As such, plaintiff posits that it is reasonable to conclude that both his race and national origin contributed to his discrimination.

The court finds it significant that plaintiff was not represented by counsel when he filed his claim with the EEOC. Additionally, it is reasonable to conclude that the plaintiff's charge of discrimination on the basis of national origin fell within the scope of the EEOC investigation reasonably expected to grow out of the plaintiff's charge of discrimination on the basis of race. *See Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir. 1991) (stating that "[b]ecause [the plaintiff's] race and Indonesian ancestry are closely related and may have both contributed to any discrimination he suffered, the district court could have concluded that an investigation could reasonably include discrimination based on race and national origin"). Thus, plaintiff's claim of discrimination on the basis of national origin is found to not be jurisdictionally barred.

**HOSTILE WORK ENVIRONMENT**

Plaintiff also contends that defendants subjected him to a hostile work environment because of his race and/or national origin. In order to establish a viable hostile work environment claim, plaintiff must prove that (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of his race/national origin; (4) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile or offensive work environment; and (5) the existence of employer liability. *Vitt v. City of Cincinnati*, 97 Fed. Appx. 634, 638 (6th Cir. 2004)(citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)). In determining whether harassment is sufficiently severe or pervasive so as to be actionable, the court must look to the totality of the circumstances. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). A court is to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; [and] whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21-23. Further, the pervasiveness requirement incorporates both an objective and a subjective component. The court must first determine whether the plaintiff himself perceived the environment to be pervasively hostile, then determine whether a reasonable person under the same conditions would perceive it as such. *Harris*, 510 U.S. at 21-22.

Defendant argues that plaintiff's allegations do not rise to the level of severity or pervasiveness necessary to constitute actionable harassment. According to CTI, the conduct of which plaintiff complains, when taken in its context, reveals that it consists of

12

"offhand comments and isolated incidents" which do "not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal citations omitted). Defendant notes that at the time of Hartford's comment, she was not plaintiff's supervisor. Additionally, CTI argues that while Hartford participated in the PIP process, the decision to terminate plaintiff's employment was made by Lasater. Thus, defendant asserts that because Hartford did not make the decision to terminate plaintiff's employment, her alleged comment is irrelevant and insufficient to constitute evidence of discrimination sufficient to establish a hostile work environment. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990) (holding that alleged remarks evidencing discriminatory animus made by a supervisor are not attributable to the actual decision-maker).

Defendant further asserts that plaintiff's allegation concerning the display of the stuffed black monkey is highly suspect. According to CTI, plaintiff made no mention of the stuffed animal in his original complaint nor in his charge of discrimination with the EEOC. The allegation regarding the stuffed black monkey did not surface until plaintiff's counsel asked witnesses for CTI whether they recalled seeing a stuffed animal displayed at CTI. Even after it was mentioned by plaintiff's counsel, according to defendant, Cole failed to volunteer the alleged incident during his own deposition. It was not until further pressed that plaintiff alleged he saw the monkey on a desk of a co-worker.

Nevertheless, even if plaintiff's allegation is taken as true, as is required for purposes of this motion, defendant argues the display of the stuffed black monkey with the derogatory word is not harassing conduct. CTI stresses that by plaintiff's own admission, because he is Nigerian, he "did not have that much sensitivity to it" and did not want to believe that it was directed toward him, so he ignored it in order that no one would know he was bothered by it. Defendant argues that because this conduct was not directed toward plaintiff, it is not persuasive evidence in support of his claim of harassment. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 760-61 (6th Cir. 2000) (finding harassment will be more severe if offensive comments were directed at a plaintiff).

Plaintiff asserts the harassment he suffered was sufficiently severe and pervasive to constitute actionable harassment. According to Cole, the derogatory remarks, racist displays, and excessive work assignments to which he was subjected were both routine and continuing in nature. Plaintiff posits that when determining whether harassment is sufficiently severe and pervasive to be actionable, "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether - taken together - the reported incidents make out such a case." *Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir. 1999). Plaintiff argues that in this case, when taken together, the evidence creates a genuine issue of material fact from which a rational trier of fact could conclude that the plaintiff was subjected to a hostile work environment due to his race and/or national origin.

14

**EMPLOYER LIABILITY**

Because plaintiff bases his harassment claim on the alleged conduct of co-workers, to establish employer liability, plaintiff "must also prove that his ... employer tolerated or condoned the situation or that the employer knew or should have known of the alleged conduct, and failed to take prompt remedial action." *Jackson,* 191 F.3d at 659. CTI has an anti-harassment policy and argues that plaintiff failed to complain regarding any of the perceived harassment. Absent any such complaint, CTI asserts it was powerless to investigate or attempt to remedy plaintiff's now-asserted allegations of harassment. Moreover, defendant contends plaintiff's complaint about his second PIP was promptly investigated by Etherton, who met with Cole to discuss the PIP process. Therefore, defendant asserts plaintiff has not established the elements necessary to show that CTI knew or should have known of the alleged harassment.

According to plaintiff, there are genuine issues of material fact as to whether CTI tolerated or condoned the remarks made by Hartford, based on the fact that she was never reprimanded for her remarks; in fact, she was later promoted. Cole further notes that the racist display by DeMarcus was out in the open for everyone to see, including CTI supervisors, yet there was no disciplinary action taken against her. Additionally, in March 2003, plaintiff did formally complain to his employer as to the unwarranted barrage of PIPs and extra work that was assigned to him. Thus, plaintiff contends that from these facts, a jury could reasonably conclude that CTI either "tolerated or condoned" the treatment of Cole or that CTI "knew or should have known of the alleged conduct and failed to take prompt remedial action." *See Jackson*, 191 F.3d at 659.

15

**RETALIATION**

In order to establish a *prima facie* case of retaliation, plaintiff must prove the following four elements by a preponderance of the evidence: (1) he engaged in a protected activity; (2) CTI knew of such activity; (3) CTI thereafter took an adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367 (6th Cir. 2002).

Defendant asserts plaintiff cannot satisfy his burden because he is unable to establish that he engaged in protected activity, that the individual who made the decision to terminate his employment knew that he had engaged in protected activity, or that there was a causal connection between the alleged protected activity and his termination. Even if plaintiff can establish that he engaged in protected activity, CTI asserts plaintiff cannot establish a *prima facie* case of retaliation because plaintiff has not demonstrated that the individual who made the decision to terminate his employment, Lasater, had knowledge of his alleged protected activity.

Plaintiff claims it is clear that he engaged in a protected activity when he wrote his letter to Gill on or about March 7, 2003. According to Cole, he complained in the letter about the harassing nature of the excessive and unnecessary work assigned by Hartford, who was his supervisor at the time the letter was written. Plaintiff contends the excessive and unnecessary work assignments were part of a severe and pervasive pattern of harassment carried out by Hartford, which was meant to intimidate him in

16

order to ultimately force him to resign. Cole argues the concerns he raised in his complaint letter were never addressed by Gill or CTI. He claims that Hartford, Cromer and Lasater conspired to continually harass, intimidate, and threaten him with termination from his employment. However, despite his situation, plaintiff asserts he performed his job in an exemplary manner and met all project deadlines that he was required to accomplish, regardless of the unrealistic timetables under which he was given to work.

Plaintiff argues that CTI had knowledge of the letter written to Gill and, therefore, had knowledge that Cole had exercised his civil rights. Cole states that contrary to defendant's contention that there is no evidence that Lasater was aware of the complaint letter to Gill, Lasater's denial of plaintiff's request for tuition reimbursement merely three months after the letter was written and despite the fact that similarly situated employees had all been granted similar requests is sufficient circumstantial evidence from which a trier of fact could reasonably conclude that Lasater was aware of the letter and that he was retaliating against Cole because of the letter. *See Allen v. Michigan Dept. of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999) (holding that a plaintiff may survive summary judgment by producing circumstantial evidence to establish knowledge by the relevant decision maker). Plaintiff further contends the evidence illustrates a causal connection between the protected activity engaged in by Cole and the adverse employment actions taken by CTI. Cole notes he was subjected to the second PIP by Hartford almost immediately after his letter to Gill. Therefore, plaintiff asserts the temporal proximity of the letter written by Cole and the actions by the

employer are so acutely near in time that a trier of fact could reasonably infer retaliation. *See DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (citing Brown v. ASD Computing Cir., 519 F.Supp. 1096, 1116 (S.D. Ohio 1981) ("where there is no direct proof of a retaliatory motive, retaliation may be imputed if the timing of the retaliatory act is such as to allow an inference of retaliation to arise").

**PRETEXT**

Defendant asserts that even if plaintiff could establish *prima facie* cases of discrimination and retaliation, it has rebutted those cases by articulating legitimate, non-discriminatory reasons for plaintiff's PIPs and termination. Thus, defendant argues plaintiff's claims can survive summary judgment only if he proves that CTI's articulated reasons were a pretext. *Williams v. The Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997). To establish pretext, plaintiff must prove by a preponderance of the evidence that CTI's reasons had no basis in fact, that the reasons did not actually motivate his discharge, or that the reasons were insufficient to motivate his discharge. *Covington v. MCI Worldcom Network Svcs., Inc.*, No. 01-6139, 2004 WL 619372 at *1 (6th Cir., Mar. 26, 2004) (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994)).

Cole notes that on a motion for summary judgment, the plaintiff does not have to totally refute the defendant's assertions as to its reasons for its actions, but instead must only present some evidence sufficient to create a genuine issue of material fact as to the motivations of the defendant. *Dennis v. White Way Cleaners, L.P.*, 119 S.W.3d

18

688, 694 (Tenn. App. 2003). Plaintiff stresses that the Sixth Circuit has recognized in discrimination and retaliation cases that an employer's true motivation is particularly difficult to ascertain. *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 (6th Cir. 2004). Therefore, courts should exercise caution in granting summary judgment once a plaintiff has established a *prima facie* inference of discrimination and/or retaliation through direct or indirect means. *Singfield*, 389 F.3d at 564; citing with approval *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985) (stating that very little additional evidence is required to raise a genuine issue of fact regarding motive, and concluding that summary judgment on the merits is ordinarily inappropriate once a *prima facie* case has been established).

To refute CTI's assertion that its actions were non-pretextual, plaintiff relies on CTI's determination that Cole performed well enough to earn some form of bonus pay and Hartford's acknowledgment that Cole successfully completed the PIP. Plaintiff further asserts that the statements made by Hartford, the display by DeMarcus, as well as the fact that not a single African American or other non-white person was employed in a managerial position at the time of plaintiff's employment, are all facts that speak to the defendant's real motivation in firing Cole.

In its pleadings, defendant has provided very compelling arguments, but upon reviewing the record as a whole and in a light most favorable to plaintiff as required for purposes of determining whether summary judgment is appropriate, the court believes genuine issues of material fact exist regarding plaintiff's discrimination and retaliation

19

claims that must be presented to a jury. Under the facts of this case, whether plaintiff has experienced an adverse employment action is also an issue for the jury to decide. Accordingly, defendant's motion for summary judgment [ECF # 43] is **DENIED**.

**IT IS SO ORDERED.**

                                              **ENTER:**

                                              **s/Thomas W. Phillips**
                                        **UNITED STATES DISTRICT JUDGE**